**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| SOUTHERN CLIPPER, INC., on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | **C/A No.: 2:21-cv-2153-BHH** |
| v. | ) ) | JURY TRIAL DEMANDED |
| HARTFORD FIRE INSURANCE COMPANY and THE HARTFORD FINANCIAL SERVICES GROUP, INC., DBA THE HARTFORD, | ) ) ) ) ) | |
| Defendants. | ) | |

## PLAINTIFF'S CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 1

II.  THE PARTIES ................................................................................................... 5

    Plaintiff ............................................................................................................. 5

    Defendant .......................................................................................................... 6

III. JURISDICTION AND VENUE ........................................................................ 7

IV. FACTUAL ALLEGATIONS ............................................................................ 7

    A.  The Global COVID-19 Pandemic ............................................................... 7

    B.  Steps Taken by Authorities in South Carolina to Control the Pandemic........... 10

    C.  The Damaging Impact of the COVID-19 Pandemic Plaintiff and Similar Businesses ...... 15

    D.  The Hartford's Spectrum Business Owner's Insurance Policy .......................... 16

    E.  Defendants Either Denied Coverage or Ignored Plaintiff's Claims ................... 20

    F.  The Hartford's Improper Public Denial of Coverage ........................................ 23

V.  CLASS ALLEGATIONS ................................................................................... 24

VI. JURY DEMAND ............................................................................................... 29

COUNT I: Business Income Breach Of Contract .................................................... 30

COUNT II: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Business Income ............................................................................... 31

COUNT III: Declaratory Relief Applicable to Business Income .............................. 31

COUNT IV: Extra Expense Breach of Contract ...................................................... 33

COUNT V: Breach of the Implied Covenant of Good Faith and Fair Dealing Applicable to Extra Expense ................................................................................... 34

COUNT VI: Declaratory Relief Applicable to Extra Expense .................................. 35

VII.    PRAYER FOR RELIEF ................................................................................. 36

PLAINTIFF SOUTHERN CLIPPER, INC. ("Plaintiff"), individually and on behalf of other similarly situated persons and entities operating non-essential businesses in South Carolina, makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff brings this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against DEFENDANTS HARTFORD FIRE INSURANCE COMPANY ("Hartford Fire") and THE HARTFORD FINANCIAL SERVICES GROUP INC, DBA THE HARTFORD ("The Hartford") (collectively "Defendants"), demanding trial by jury.

## I.   NATURE OF THE ACTION

1.   Plaintiff owns and operates Great Clips franchised hair salons in the Charleston, South Carolina area. To make sure that it would be protected if it was forced to temporarily cease some or all of its operations by unanticipated events beyond its control, it purchased a commercial insurance policy from Defendants covering the period of January 16, 2020-January 16, 2021. That policy is attached hereto as Exhibit A.

2.   Such an event, the worst health crisis to hit the State of South Carolina, the United States, and indeed the world in over a century, arrived in early 2020 in the form of a pandemic of a disease called COVID-19, causing a massive number of illnesses and numerous deaths.

3.   Like Plaintiff, many hair salons and other businesses that operate services that are considered non-essential have purchased insurance from The Hartford to protect against losses from catastrophic events like the current unforeseen COVID-19 pandemic. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to the property. This coverage is commonly known as "business interruption" or "business income" coverage.

1

4.   Insurance is a way to manage risk, providing protection from financial loss. It is particularly appropriate – indeed, vital – for protection against losses that, while unlikely to occur, would be financially devastating if they do occur. As The Hartford explains on its website, insurance protects you from the unexpected:[1]



5.   The Hartford's website includes a clever video to explain why businesses should purchase insurance:



The narrator begins by saying, "Most business owners don't think they'll ever need to use their insurance," while a hand draws the company's symbol and the word "Business" as shown above. *Id*.

---

[1] https://www.thehartford.com/business-insurance (accessed 6/14/2021).



He continues: "But within a 10-year span, over 40% experience an event that leads to a claim."



Continuing: "Making sure unfortunate events won't cost you your livelihood …



3

"… is just one way The Hartford can help you prevail when the unexpected strikes."



"At The Hartford we offer broad protection for small, mid-sized and enterprise-level businesses across a wide range of industries." *Id*.

6.    The COVID-19 pandemic is the epitome of the unexpected catastrophic event. As a result of this pandemic, beginning in mid-March, local governments in the Charleston area began imposing restrictions that made it impossible for hair salons and other non-essential businesses to stay open,[2] and on March 31, 2020 the State of South Carolina ordered hair salons and other non-essential businesses to shut down.[3]

7.    However, despite the provision of business income coverage in its policies, Defendants are refusing to comply with their obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of their insured property arising from the COVID-19 pandemic.

8.    Defendants seek to justify their decision to unilaterally and preemptively deny coverage owed to their insureds on grounds that are patently specious. They state that there is no coverage

---

[2] *See*, *e.g.*, City of Charleston Updates, https://www.charleston-sc.gov/2408/City-of-Charleston-Coronavirus-Updates (accessed 6/14/2021).
[3] Executive Order No. 2020-17, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-31%20FILED%20Executive%20Order%20No.%202020-17%20-%20Closure%20of%20Non-Essential%20Businesses.pdf (accessed 6/14/2021).

because a virus cannot cause physical loss or damage to property as required by the policies. However, beginning in 2006, Defendants' policies specifically *excluded* certain types of property loss or damage caused by viruses (though not the type of losses sustained by Plaintiff). If viruses could not cause property loss or damage, there would have been no reason to exclude them from the policy because they wouldn't have been covered to begin with.

9.  Defendants denied Plaintiff's claim on the equally specious ground that "the coronavirus did not cause property damage at [Plaintiff's] place of business. (*See* Exhibit C at 1.) But, as noted above, the policy also provides coverage in the event of "loss of … property." To avoid coverage, Defendants are attempting to rewrite the policy.

10. Plaintiff brings this action on behalf of a class of South Carolina businesses categorized as non-essential by the State of South Carolina and that purchased standard commercial property insurance policies from The Hartford that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics, and that shut down when they were at first urged and then required to do so, with resulting business income losses and extra expenses.

11. This action also seeks a declaratory judgment that Defendants are contractually obligated to pay these losses. In addition, Plaintiff seeks damages, attorneys' fees and costs, and any other relief that this Court deems equitable and just, arising out of Defendants' breach of contract and wrongful conduct alleged herein.

## II.  THE PARTIES

**<u>Plaintiff</u>**

12. Plaintiff Southern Clipper, Inc. is a corporation incorporated in the State of South Carolina with its principal place of business in Mt. Pleasant, South Carolina.

13. Plaintiff owns and operates 11 franchised Great Clips hair salons in the Charleston area:

   1.  616 Long Point Rd., Unite B, Mt. Pleasant 29464 (Charleston County).

5

2. 113 Market Center Blvd., Mt. Pleasant 29464 (Charleston County).

3. 7250 Rivers Ave., Bldg. 500, North Charleston 299406 (Charleston County).

4. 1545 Old Trolley Rd., Summerville 29485 (Dorchester County).

5. 1739 Maybank Hwy, Ste. 8, Charleston 29414 (Charleston County).

6. 4948 Centre Pointe Dr., Ste. C101 North Charleston 29418 (Charleston County).

7. 9500 Dorchester Rd., Ste. 316, Summerville 29485 (Dorchester County).

8. 214 Azalea Square Blvd., Ste. D, Summerville 29483 (Dorchester County).

9. 920 Houston Northcutt Blvd., Ste. A6, Mt. Pleasant 29464 (Charleston County).

10. 469 North Hwy 52, Ste. B, Moncks Corner 29461 (Berkeley County).

11. 1711 Clements Ferry Rd., #207-C, Charleston 29492 (Berkeley County).

12. 3863 West Ashley Circle, Bldg. A, Unit 210, Charleston 29414 (Charleston County).

14.  Because of the COVID-19 pandemic, it closed them all for eight weeks or longer beginning in March, 2020. Since re-opening it has had to incur extra expenses to remain open during the pandemic.

**Defendants**

15. The Hartford is an insurance company incorporated in Delaware with its principal place of business at One Hartford Plaza, Hartford, CT 06155. On its website, The Hartford states: "Companies have been protecting themselves in South Carolina with business insurance from The Hartford for hundreds of years."[4]

16. Hartford Fire is an insurance company incorporated in Connecticut with its principal place of business at One Hartford Plaza, Hartford, CT 06155.[5] It is a wholly owned subsidiary of The Hartford.

---

[4]  https://www.thehartford.com/business-insurance/south-carolina (accessed 6/14/2021).
[5]  https://sbs.naic.org/solar-external-lookup/lookup/company/summary/94305511?jurisdiction=SC (accessed (6/14/2021).

### III.JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of the class; and the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

18. The facts set forth in this Complaint show that this Court has personal jurisdiction over these Defendants. There is personal jurisdiction over The Hartford for the additional reason that it regularly withdraws payments for Plaintiff's insurance premiums via ACH draft from Plaintiff's bank account.

19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district. Venue is proper in the Charleston Division pursuant to Local Civil Rule 3.01(a)(1) because a substantial part of the events or omissions giving rise to the claim occurred in Charleston County.

### IV.FACTUAL ALLEGATIONS

#### A.  The Global COVID-19 Pandemic

20. According to the World Health Organization ("WHO") COVID-19 is an infectious disease for which there only recently were effective vaccines to combat its spread.[6] It spreads easily from person-to-person.

21. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others.[7] This can

---

[6]  https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 6/14/2021).
[7] WHO, https://www.who.int/health-topics/coronavirus#tab=tab_1 (last visited June 14, 2021).

occur even if the person is asymptomatic.[8] As WebMD states, "[s]ome people who don't know they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[9]

22. Thus, absent testing, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

23. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[10]

24. The coronavirus can also infect people who touch surfaces, such as countertops, doorknobs, furniture – and, of course, hair cutting and styling equipment – that contain the virus. It can live on plastic and stainless steel for up to three days.[11]

25. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[12] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[13] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019."[14]

26. After it was first discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[15]

---

[8] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 6/14/2021).
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[13] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[14] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).
[15] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).

27. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[16]

28. At the point that WHO labeled COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[17]

29. According to the COVID Tracking Project, 2,873 patients at that point had tested positive in the United States, and 43 patients had died.[18] From March 11 on, the number of cases and deaths increased rapidly. By March 23, 2020, the number of cases in this country had increased more than 18 times to 53,611 and deaths had increased by 12 times to 568.

30. Since then, the effects of the pandemic in this country have not only continued, they have gotten worse. As of June 14, 2021, 34.3 million Americans had tested positive for COVID-19, and more than 615,000 people had died from the disease, more than any other country in the world.[19]

31. South Carolina was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there were only nine reported cases in South Carolina and no deaths. But by March 31, when Gov. McMaster ordered non-essential businesses to close, positive tests had skyrocketed to 1,083 and 22 South Carolinians had died of the disease. As of June 14, 2021, there have been 594,805 cases, and 9,776 COVID-19 deaths in this state.[20]

---

[16] https://www.merriam-webster.com/dictionary/pandemic (accessed 6/14/2021).
[17] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[18] https://covidtracking.com/data/us-daily (accessed 7/28/2020).
[19] https://www.worldometers.info/coronavirus/ (accessed 6/14/2021).
[20] https://www.worldometers.info/coronavirus/usa/south-carolina/ (last visited 6/14/2021).

32. The following graphs presented by the COVID Tracking Project show dramatically that, although the rate of cases, hospitalizations and deaths per million people in South Carolina started out lower than the country as a whole (shown in dashed lines), they caught up in June, 2020 and from then on were far worse:[21]



33. The rate of infection in the Charleston area, where Plaintiff's salons are located, caught up with and even surpassed the rest of the country in some metrics. As of August 3, 2020, per 100,000 residents in Charleston County, there were 2,818 cases and 41 deaths; in Dorchester County: 1,744 cases and 25 deaths; and in Berkeley County: 1,691 cases and 26 deaths.[22]  That compares to 1,442 cases and 48 deaths per 100,000 in the United States as a whole.[23]

**B.  Steps Taken by Authorities in South Carolina to Control the Pandemic**

34. On March 13, 2020, Governor McMaster declared a state of emergency in South Carolina due to the COVID-19 pandemic.[24]

---

[21] https://covidtracking.com/data/state/south-carolina
 (accessed 8/3/2020).
[22] https://www.nytimes.com/interactive/2020/us/south-carolina-coronavirus-cases.html (accessed 8/3/2020).
[23] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 7/26/2020).
[24] Executive Order 20-08, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-13%20FILED%20Executive%20Order%20No.%202020-08%20-

35. In the next few days, local governments in the Charleston area began taking measures that made it impossible for Plaintiff and other businesses to keep their doors open.

36. Initially, on March 20, 2020, Mayor John Tecklenburg of Charleston asked all citizens to "[s]tay home and limit trips to only those that are essential in order to reduce the spread of this virus."[25]

37. Two days later, on March 22, officials from Charleston County, the Cities of Charleston and North Charleston and the Town of Mt. Pleasant – where all of Plaintiff's salons are located – held a press conference to urge their citizens to stay home. As Mayor Tecklenburg put it, "If you don't have an essential reason to go out, don't go out. The life you save by avoiding that unnecessary trip could turn out to be yours or one of your loved ones." Mayor Tecklenburg had a similar message for businesses: "If your business is not truly essential during this time, temporarily closing your doors or having your employees work from home now is a hard choice to make -- but it's infinitely better than the economic and social devastation that you and the rest of us will suffer if this virus gets out of control in our area.." *Id.*

38. On March 23, 2020, Charleston County Chairman Elliott Summey urged citizens to stay home.[26]

39. On March 24, the City of Charleston issued a stay-at-home ordinance that mandated the closing of non-essential businesses, including hair salons and other businesses.[27]

40. Governor McMaster began issuing statewide orders closing businesses a week later. On March 31, in Executive Order No. 20-17, Governor McMaster ordered non-essential businesses,

---

%20State%20of%20Emergency%20Due%20to%20Coronavirus%20(COVID-19).pdf; press release, https://governor.sc.gov/news/2020-03/gov-henry-mcmaster-declare-state-emergency-order-lancaster-kershaw-county-schools (both accessed 6/14/2021).

[25] https://www.charleston-sc.gov/2408/City-of-Charleston-Coronavirus-Updates (accessed 6/14/2021).

[26] https://www.charlestoncounty.org/news/2020/4400.pdf (accessed 6/14/2021).

[27] https://www.charleston-sc.gov/2408/City-of-Charleston-Coronavirus-Updates (accessed 6/14/2021).

including hair salons, to close for access or use by the public.[28] He specifically included the following categories of non-essential businesses:

   1. Entertainment venues and facilities as follows:

      (a) Night clubs

      (b) Bowling alleys

      (c) Arcades

      (d) Concert venues

      (e) Theaters, auditoriums, and performing arts centers

      (f) Tourist attractions (including museums, aquariums, and planetariums)

      (g) Racetracks

      (h) Indoor children's play areas, with the exception of licensed childcare facilities

      (i) Adult entertainment venues

      (j) Bingo halls

      (k) Venues operated by social clubs

   2. Recreational and athletic facilities and activities as follows:

      (a) Fitness and exercise centers and commercial gyms

      (b) Spas and public or commercial swimming pools

      (c) Group exercise facilities, to include yoga, barre, and spin studios or facilities

      (d) Spectator sports

      (e) Sports that involve interaction in close proximity to and within less than six (6) feet of another person

      (f) Activities that require the use of shared sporting apparatus and equipment

      (g) Activities on commercial or public playground equipment

   3. Close-contact service providers as follows:

---

[28]Executive Order, 20-17, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-03-31%20FILED%20Executive%20Order%20No.%202020-17%20-%20Closure%20of%20Non-Essential%20Businesses.pdf (accessed 6/14/2021).

(a) Barber shops

(b) Hair salons

(c) Waxing salons

(d) Threading salons

(e) Nail salons and spas

(f) Body-art facilities and tattoo services

(g) Tanning salons

(h) Massage-therapy establishments and massage services. [29]

41. On April 3, 2020, in Executive Order No. 20-18, Governor McMaster expanded the list of non-essential businesses ordered to close to add the following:[30]

Retail stores as follows:

(a) Furniture and home-furnishings stores

(b) Clothing, shoe, and clothing-accessory stores

(c) Jewelry, luggage, and leather goods stores

(d) Department stores, with the exception of hardware and home-improvement stores

(e) Sporting goods stores

(f) Book, craft, and music stores

(g) Flea markets

(h) Florists and flower stores

42. The closure of these non-essential businesses was reiterated on April 6, 2020, in Executive Order No. 20-21.[31]

---

[29] *Id.*

[30] Executive Order, 20-18, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-03%20eFILED%20Executive%20Order%20No.%202020-18%20-%20Closure%20of%20Additional%20Non-Essential%20Businesses.pdf (accessed 6/14/2021).

[31] Executive Order 20-21, https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-06%20eFILED%20Executive%20Order%20No.%202020-21%20-%20Stay%20at%20Home%20or%20Work%20Order.pdf (accessed 6/14/2021).

43. In Executive Order No. 20-28, retail stores were allowed to re-open on April 20, 2020, but not other non-essential businesses.[32]

44. The following non-essential businesses were allowed to re-open on May 18, 2020, under Executive Order 2020-36:[33]

    1. Recreational and athletic facilities and activities as follows:

        (a) Fitness and exercise centers and commercial gyms

        (b) Spas and public or commercial swimming pools

        (c) Group exercise facilities, to include yoga, barre, and spin studios or facilities

    2. Close-contact service providers as follows:

        (a) Barber shops

        (b) Hair salons

        (c) Waxing salons

        (d) Threading salons

        (e) Nail salons and spas

        (f) Body-art facilities and tattoo services

        (g) Tanning salons

        (h) Massage-therapy establishments and massage services

45. Executive Order 2020-37 allowed the remaining non-essential businesses to re-open on May 22, 2020.[34]

---

[32] https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-04-20%20FILED%20Executive%20Order%20No.%202020-28%20-%20Modification%20of%20Restrictions%20for%20Public%20Beaches%20%26%20Waters%20%26%20Incremental%20Modification%20of%20Non-Essential%20Business%20Closures.pdf (accessed 6/14/2021).

[33] https://governor.sc.gov/sites/default/files/Documents/Executive-Orders/2020-05-15%20FILED%20Executive%20Order%20No.%202020-36%20-%20Additional%20Incremental%20Modification%20 (accessed 8/4/2020).

[34] https://governor.sc.gov/sites/default/files/Documents/2020-05-21%20FILED%20Executive%20Order%20No.%202020-37%20-%20Additional%20Incremental%20Modification%20of%20Non-Essential%20Business%20Closures.pdf (accessed 6/14/2021).

**C. The Damaging Impact of the COVID-19 Pandemic on Plaintiff and Similar Businesses**

46. The COVID-19 pandemic, along with the restrictions described above, have had a devastating impact on Plaintiff's business.

47. All of Plaintiff's salons closed in March 2020 because of the COVID-19 pandemic.

48. As the pandemic began to take hold, Plaintiff found itself having difficulty obtaining enough staff to keep all of its salons open and closed its Point Hope salon (1711 Clements Ferry Rd.) on March 13 and its Moncks Corner salon on March 21.

49. Plaintiff closed its remaining nine salons on March 23, the day after the leaders of the Cities of Charleston and North Charleston, the Town of Mr. Pleasant and Charleston County all urged residents to stay home except for essential activities and non-essential businesses to close.

50. Plaintiff had been planning to open its West Ashley Circle on April 20, 2020. Because of the pandemic, it could not do that.

51. Plaintiff reopened seven of its salons on May 18, 2020. Because of the difficulty obtaining staffing during the pandemic, it was unable to reopen two of its salons until July 6, 2020. Plaintiff has still not been able to reopen the Village Pointe (920 Houston Northcutt Blvd.) salon due to an inability to obtain staff. Plaintiff anticipates that it will be unable to reopen the Village Point salon at this point. And although Plaintiff was able to open the Centre Point salon on July 6, 2021, it was forced to close the salon on December 15, 2020 due to a lack of staff and was only able to reopen the salon on June 23, 2021. Plaintiff was able to reopen the Point Hope salon on March 1, 2021. Further, Plaintiff was able to open its newest salon at West Ashley Circle on September 8, 2020.

52. Obviously, because of the pandemic, Plaintiff's business is still not back to normal.

53. Since reopening, Plaintiff has had to pay substantial extra expenses, such as for additional capes because of the need not to reuse them between customers. It has also had to purchase masks, gloves, disinfectant spray and wipes, hand sanitizer, additional hand soap and additional paper towels. It has had to convert a shampoo bowl in each salon into a handwashing station. It had to hire extra receptionists and "Hair Traffic Controllers" to stand outside the salons and sign people in, instruct then on the new procedures, and allow them to enter. It has had to give its staff extra training on all the required steps and precautions regarding sanitizing the salon and how to handle customers who may have a problem with masks or the procedures, as well as in cutting hair while the customer is wearing a mask.

54. Nationwide, the hair salon industry has been devastated by COVID-19. One survey, conducted from May 15-June 5, 2020, found that 70% had to furlough or layoff staff during the shutdown. Only 23% had reopened at the time they responded.[35]

55. The Professional Beauty Association states: "Salons across the country are struggling financially and many will not make it through this crisis."[36]

**D.  The Hartford's Spectrum Business Owner's Insurance Policy**

56. In exchange for premiums paid to Defendants, Plaintiff obtained a Spectrum Business Owner's Policy, Number 76 SBW BA3853 76A, covering a Policy Period from 1/16/20 to 1/16/21, issued by The Hartford, with Hartford Fire as the "insurer." Exhibit A at 17 (page numbers of the exhibit are shown in the lower right).

57. The policy's Special Property Coverage Form provides coverage "for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also

---

[35] https://salonspanetwork.org/beauty-pulse-survey-covid-19-recovery/ (accessed 6/14/2021).
[36] https://www.probeauty.org/advocacy/fica (accessed 6/14/2021).

called 'scheduled premises' in this policy) caused by or resulting from a Covered Cause of Loss." Ex. A at 54.

58. The scheduled premises are the locations of Plaintiff's salons. Ex. A at 18-39; Ex. B at 1 (endorsements adding 1711 Clements Ferry Rd., Suite 106, and 3863 W. Ashley Cir. Unit 210, Bldg A).

59. "Covered Property" means the buildings and structures at those addresses, including fixtures, machinery, and certain other property. Ex. A at 54. In other words, the Covered Property consists of the locations where Plaintiff's salons are located.

60. The COVID-19 pandemic caused a direct physical loss of Plaintiff's Covered Property at the scheduled premises by denying it the ability to physically access and use the property in the normal fashion in its business; it is therefore a covered loss.

61. The coverage provided by the policy includes loss of Business Income:

> We will pay for the actual loss of Business Income you sustain due to the necessary suspension of your 'operations' during the 'period of restoration'. The suspension must be caused by direct physical *loss of* or physical damage to property at the 'scheduled premises', including personal property in the open (or in a vehicle) within 1,000 feet of the 'scheduled premises,' caused by or resulting from a Covered Cause of Loss.

Ex. A at 63 (emphasis added).

62. "Operations" means "your business activities occurring at the 'scheduled premises ….'" Ex. A at 77. In other words, that is the services Plaintiff provides for its customers.

63. "Period of restoration" means the period "begin[ning] with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the 'scheduled premises'" and ending when the property is restored. Ex. A at 77-78. Thus, it is the period when the property cannot be used for Plaintiff's business because of the COVID-19 pandemic.

17

64. The policy provides that, for purposes of the above provision, "suspension" includes "[t]he partial slowdown or complete cessation of your business activities." Ex. A at 63. Because Plaintiff's business activities suffered a partial slowdown or complete cessation, it experienced a suspension.

65. The COVID-19 pandemic is a "Covered Cause of Loss" under the policy. Covered Causes of Loss are defined as follows:

> RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>
> **a.** Excluded in Section **B., EXCLUSIONS;** or
>
> **b.** Limited in Paragraph **A.4.** Limitations ….

Ex. A at 55. Because the COVID-19 pandemic created a risk of direct physical loss, it is a "Covered Cause of Loss" unless excluded or limited. None of the Exclusions in Section B or the Limitations in Paragraph A.4 apply to COVID-19. *See* Ex. A at 55, 69-71. Nor, as described more fully below does the policy's "Virus Exclusion" apply. Therefore, COVID-19 is a covered cause of loss.

66. Plaintiff's policy also covers its "Extra Expense" for expenditures made necessary by the COVID-19 pandemic. Ex. A at 63. Specifically, the policy states:

> (1) We will pay reasonable and necessary Extra Expense you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises'… caused by or resulting from a Covered Cause of Loss.
>
> ***
>
> (3) Extra Expense means expense incurred:
>
>> (a) To avoid or minimize the suspension of business and to continue 'operations':
>>
>>> (i) At the 'scheduled premises'; …
>>
>> (b) To minimize the suspension of business if you cannot continue "operations".

18

> (i) To repair or replace any property …
>
> to the extent it reduces the amount of loss that otherwise would have been payable under this Additional Coverage or Additional Coverage **o**., Business Income.
>
> We will only pay for Extra Expense that occurs within 12 consecutive months after the date of direct physical loss or physical damage. This Additional Coverage is not subject to the Limits of Insurance.

Ex. A at 63-64.

67. The policy also covers Plaintiff's Extended Business Income for losses that occur after the property is restored, as follows:

> (1) If the necessary suspension of your 'operations' produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:
>
>> (a) Begins on the date property is actually repaired, rebuilt or replaced and 'operations' are resumed; and
>>
>> (b) Ends on the earlier of:
>>
>>> (i) The date you could restore your 'operations' with reasonable speed, to the condition that would have existed if no direct physical loss or damage occurred; or
>>>
>>> (ii) 30 consecutive days after the date determined in (1)(a) above.
>
> Loss of Business Income must be caused by direct physical loss or physical damage at the 'scheduled premises' caused by or resulting from a Covered Cause of Loss.
>
> (2) With respect to the coverage provided in this Additional Coverage, suspension means:
>
>> (a) The partial slowdown or complete cessation of your business activities; and
>>
>> (b) That a part or all of the 'scheduled premises' is rendered untenantable as a result of a Covered Cause of Loss.

Ex. A at 64.

68. Plaintiff and Class Members are entitled to coverage under the above provisions.

### E. Defendants Denied Coverage

69. Plaintiff made a claim under the policy for its COVID-19 losses and extra expenses in March 2020. This claim was denied.

70. The Hartford rejected the claim by letter dated March 26, 2020, signed by Jonathan Maxwell, identified as "Outside Claim Rep" with The Hartford.

71. Mr. Maxwell states that there are two reasons why The Hartford denied coverage. First, he says that, "since the coronavirus did not cause property damage at your place of business or in the immediate area, this business income loss is not covered." Ex. C at 1. He goes on to state: "The Business Income coverage is not provided for your claim because there has been no physical loss or damage caused by or resulting from a Covered Cause of *Loss to property* at a scheduled premises." Ex. C at 3 (emphasis added.)

72. This is a blatant misparaphrase of the policy. The policy covers a loss "of" the property, not *to* the property. *See* Ex. A at 54 ("direct physical loss of or physical damage to Covered Property"). What it covers that happens "to" the property is damage, not loss. As described above, there was a necessary suspension of Plaintiff's operations caused by a loss "of" the property resulting from a Covered Cause of Loss – namely the worldwide pandemic – because Plaintiff lost access to the property to conduct its normal business.

73. Mr. Maxwell also states that Hartford relies on a "Virus Exclusion" in the policy. He states: "Even if the virus did cause damage, it is excluded from the policy …." Ex. C at 1. This is a flagrant mischaracterization of the Virus Exclusion because Plaintiff's losses were caused by the COVID-19 pandemic, rather than the presence of coronavirus.

74. The Virus Exclusion states:

### i. "Fungi", Wet Rot, Dry Rot, Bacteria And Virus

We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss:

(1) *Presence*, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or *virus*.

Ex. A at 145 (emphasis added).

75.   The Hartford knows that the Virus Exclusion does not apply to losses due to the COVID-19 pandemic because, as shown below, it did not include it on its website as a reason for refusing coverage for such losses. Plaintiff's losses were not caused by the presence of viruses in its premises. There is no evidence that the virus has ever been in its premises. Plaintiff's losses were caused by the worldwide pandemic and, as recommended and later mandated by local authorities, the resulting closure of its businesses.

76.   If The Hartford had intended to exclude losses that might be related to a pandemic or to a virus in another location than the insured's property, it could have so provided but did not.

77.   Moreover, even if the Virus Exclusion were applicable to Plaintiff's losses (and those of other members of the proposed classes), under the principles of equitable estoppel and general public policy, Defendants should be estopped from enforcing it.

78.   Specifically, in 2006, two insurance industry trade groups, the Insurance Service Office ("ISO") and the American Association of Insurance Services ("AAIS"), represented hundreds of insurers in a national effort to seek approval from state insurance regulators for the adoption of the Virus Exclusion.

79.   In filings with state regulators, ISO and AAIS, on behalf of insurers, represented that the adoption of the Virus Exclusion was only meant to "clarify" that coverage for "disease-causing agents" has never been in effect, and was never intended to be included, in the property policies.

80.   In a July 6, 2006, "ISO Circular" entitled "New Endorsements Filed to Address Exclusion

of Loss Due to Virus or Bacteria," ISO represented to the state regulatory bodies:

> While property polices have not been a source of recovery for losses involving contamination by disease-causing agents, the spector of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such polices may face claims in which there are efforts to expand coverage to create sources of recovery for such losses, contrary to policy intent.

81. Similarly, AAIS, in its "Filing Memorandum" in support of the Virus Exclusion, represented:

> Property policies have not been, nor were they intended to be, a source of recovery for loss, cost or expense caused by disease causing agents. With the possibility of a pandemic, there is concern that claims may result in efforts to expand coverage to create recovery for loss where no coverage was originally intended . . .

> This endorsement clarifies that loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded…

82. These representations of the insurance industry were false.

83. By 2006, the time of the state applications to approve the Virus Exclusion, courts had repeatedly found that property insurance policies covered claims involving disease-causing agents, and had held on numerous occasions that any condition making it impossible to use property for its intended use constituted "physical loss or damage to such property."

84. Upon information and belief, the state insurance departments relied on the industry's and The Hartford's representation in approving the Virus Exclusion for inclusion in standard comprehensive policies without a reduction in premiums to balance a reduction in coverage.

85. The assertions made by the insurance industry and The Hartford to obtain regulatory approval of the Virus Exclusion were misrepresentations and for this reason, among other public policy concerns, The Hartford should be estopped from enforcing the Virus Exclusion to avoid coverage of claims related to the COVID-19 pandemic.

86.  In securing approval for the adoption of the Virus Exclusion by misrepresenting to state regulators that the Virus Exclusion would not change the scope of coverage, The Hartford effectively narrowed the scope of the insuring agreement without a commensurate reduction in premiums charged.

87.  Under the doctrine of regulatory estoppel, which is a form of equitable estoppel, the Court should not permit The Hartford to benefit from this type of duplicitous conduct before the state regulators.

88.  The Hartford's denial letter to Plaintiff also speculates that "even if coverage were otherwise available for loss caused by coronavirus, the pollution exclusion *could* further bar coverage for the loss." Ex. C at 5 (emphasis added). This was not a ground for rejection of the claim.

89.  The Hartford's explanation further states that "[t]o the extent you are claiming physical loss or physical damage caused by loss of use or loss of market, coverage would be precluded …." Ex. C at 5. The Hartford's explanation does not explain what is meant by "loss of use or loss of market," which is not a defined term in the policy and has no clear meaning.

90.  Because Defendants refused to pay the claim within ninety days after demand was made and the refusal was without reasonable cause or in bad faith, Defendants are liable to pay all reasonable attorneys' fees incurred by Plaintiff in the prosecution of this lawsuit under S.C. Code § 38-59-40.

### F.  The Hartford's Improper Public Denial of Coverage

91.  The Hartford states the purported basis of its denial of coverage on its web site:

**COVID-19 Business Interruption Claims**

We're closely monitoring COVID-19, and we know it's affecting businesses across the country. Although most property insurance includes business

interruption coverage, coverage may be unavailable or limited *because viruses generally do not cause physical loss or damage to property as required by the polic*y. If you want to submit a claim for your business, click below.[37]

92.   This explanation is illogical and a sham because The Hartford knows that viruses can cause physical loss of or damage to property under the policies. For that reason, as shown above, the policy added a *Virus Exclusion*, which excludes some coverages resulting from viruses, in or about 2006. At the top of the Virus Exclusion page, the policy states: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY." Ex. A at 145.

93.   If a virus, even one that was present or active in the property, does not cause physical loss of or damage to the property, there would have been absolutely no reason for Defendants to change the policy by excluding viruses under certain conditions or to state in the policy that the provision changes the policy. The fact that Defendants felt the need to include an exclusion for viruses shows that Defendants know that viruses most certainly *can* cause loss of or damage to the property.

94.   The Hartford's statement on its website that business income losses due to the COVID-19 pandemic are not covered is a bad faith, improper attempt to dissuade insureds from submitting claims.

## V.  CLASS ALLEGATIONS

95.   Plaintiff brings this action on behalf of itself and as a representative of all others who are similarly situated. Under Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following classes and subclasses:

> All persons and entities operating non-essential businesses, as defined below, in South Carolina with Business Income (including Extended Business Income) coverage issued by Defendants that made claims with any Defendant for suspension (*i.e.*, the partial slowdown or complete cessation of their business activities) of business related to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as

---

[37] https://www.thehartford.com/commercial-property-insurance/claims (accessed 6/14/2021) (emphasis added).

a covered loss, or pay for the covered losses (the "Business Income Coverage Class").

All persons and entities operating non-essential businesses, as defined below, in South Carolina with Extra Expense coverage issued by Defendants that made claims with any Defendant for Extra Expense Coverage related to COVID-19 and for which Defendants have denied a claim for the expenses or have otherwise failed to acknowledge or accept as a covered expense, or pay for the covered expenses (the "Extra Expense Coverage Class").

Non-essential businesses are defined as follows:

1. Entertainment venues and facilities as follows:

(a) Night clubs

(b) Bowling alleys

(c) Arcades

(d) Concert venues

(e) Theaters, auditoriums, and performing arts centers

(f) Tourist attractions (including museums, aquariums, and planetariums)

(g) Racetracks

(h) Indoor children's play areas, with the exception of licensed childcare facilities

(i) Adult entertainment venues

(j) Bingo halls

(k) Venues operated by social clubs

2. Recreational and athletic facilities and activities as follows:

(a) Fitness and exercise centers and commercial gyms

(b) Spas and public or commercial swimming pools

(c) Group exercise facilities, to include yoga, barre, and spin studios or facilities

(d) Spectator sports

25

(e) Sports that involve interaction in close proximity to and within less than six (6) feet of another person

(f) Activities that require the use of shared sporting apparatus and equipment

(g) Activities on commercial or public playground equipment

3. Close-contact service providers as follows:

(a) Barber shops

(b) Hair salons

(c) Waxing salons

(d) Threading salons

(e) Nail salons and spas

(f) Body-art facilities and tattoo services

(g) Tanning salons

(h) Massage-therapy establishments and massage services.

4. Retail stores as follows:

(a) Furniture and home-furnishings stores

(b) Clothing, shoe, and clothing-accessory stores

(c) Jewelry, luggage, and leather goods stores

(d) Department stores, with the exception of hardware and home-improvement stores

(e) Sporting goods stores

(f) Book, craft, and music stores

(g) Flea markets

(h) Florists and flower stores

96.  Excluded from each of the above Classes are Defendants, including any entity in which

Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by

Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

97.  Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

98.  This action has been brought and may be properly maintained on behalf of the Classes proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

99.  **Numerosity.** Fed. R. Civ. P. 23(a)(1). The members of each Class are so numerous that joinder of all members is impractical. The precise number of Class members can be ascertained from Defendants' records.

100. **Commonality and Predominance.** Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

    a.  Whether Plaintiff and the Class members suffered a covered loss under the common policies issued to members of the Class;

    b.  Whether Defendants wrongfully denied all claims based on COVID-19;

    c.  Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

    d.  Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

    e.  Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

    f.  Whether Plaintiff and the Class members suffered damages as a result of Defendants' actions.

27

101. **Typicality.** Fed. R. Civ. P. 23 (a)(3). Plaintiff's claims are typical of the claims of the Classes they seek to represent. Plaintiff and all Class members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

102. **Adequacy.** Fed. R. Civ. P. 23(a)(4). Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

103. **Superiority.** Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

104. **Injunctive and Declaratory Relief.** Fed. R. Civ. P. 23(b)(2). Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class, so that final injunctive relief or declaratory relief is appropriate with respect to each Class as a whole.

105. In addition, particular issues are appropriate for certification under Fed. R. Civ. P. 23(c)(4) because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests thereon. Such particular issues include, but are not limited to:

    a. Whether the policies issued by Defendants cover Class members' Business Income losses and Extra Expenses due to the COVID-19 pandemic and public health and stay-at-home orders referred to herein;

    b. Whether the coverages for Business Income losses and Extra Expenses provided by Defendants' policies are precluded by exclusions or other limitations in those policies;

    c. Whether Defendants breached contracts by denying coverage for Business Income losses and Extra Expenses.

    d. Whether Defendants engaged in bad faith efforts to dissuade insureds from making claims for Business Income losses and Extra Expenses due to the COVID-19 pandemic; and

    e. Whether Plaintiff and Class members are entitled to actual damages and/or declaratory relief as a result of Defendants' wrongful conduct.

## VI. JURY DEMAND

106. Plaintiff demands a trial by jury on all claims so triable.

## COUNT I: BUSINESS INCOME BREACH OF CONTRACT
### (By Plaintiff and the Business Income Coverage Class)

107. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

108. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants under South Carolina law.

109. Plaintiff's policy and the policies of other Business Income Coverage Class Members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Plaintiff and Class Members for their covered losses under the policies.

110. In Plaintiff's policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

111. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

112. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under Plaintiff's policy and other Class members' policies.

113. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

114. Defendants, without justification, have refused performance under Plaintiff's policy and other Class members' policies by denying coverage for these losses and such denials were without reason. Accordingly, Defendants are in breach of Plaintiff's policy and other Class members' policies.

115. Due to Defendants' breach of Plaintiff's policy and other Class members' policies, Plaintiff and other members of the Business Income Coverage Class have suffered actual and substantial damages for which Defendants are liable and are entitled to reasonable attorneys' fees pursuant to S.C. Code § 38-59-40., in an amount to be proved at trial.

### COUNT II: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO BUSINESS INCOME
### (By Plaintiff and the Business Income Coverage Class)

116. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

117. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants under South Carolina law.

118. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Class in the following respects:

    a. The policy constitutes a mutually binding contract of insurance between Plaintiff and Defendants;

    b. Similarly, the policies of other Class members constitute mutually binding contracts of insurance between members of the Class and Defendants;

    c. Defendants have refused to pay benefits under the contracts;

    d. Defendants' refusals result from their bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract.

119. As a result of this breach, Plaintiff and the Business Income Coverage Class have been damaged in an amount to be proven at trial.

### COUNT III: DECLARATORY RELIEF APPLICABLE TO BUSINESS INCOME
### (By Plaintiff and the Business Income Coverage Class)

120. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

121. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants under South Carolina law.

122. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

123. Plaintiff's policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

124. In the policies, Defendants expressly agreed to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policies. Specifically, Defendants promised to pay for losses of Business Income sustained as a result of a business suspension.

125. Covered losses have resulted in business suspensions, which have caused Plaintiff and Class members losses.

126. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under Plaintiff's policy and other Class members' policies.

127. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

128. Defendants, without justification, have refused performance under Plaintiff's policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of Plaintiff's policy and other Class members' policies.

129.  Plaintiff and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Class members' losses.

130.  A case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Class members' policies.

## COUNT IV: EXTRA EXPENSE BREACH OF CONTRACT
### (By Plaintiff and the Extra Expense Coverage Class)

131. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

132. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendants under South Carolina law.

133. Plaintiff's policy and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

134. In Plaintiff's policy and the policies of other Extra Expense Coverage Class members, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

135. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

136. The extra expenses triggered the Extra Expense coverage under Plaintiff's policy and other Class members' policies.

137. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

138. Defendants, without justification, have refused performance under Plaintiff's policy and other Class members' policies by denying coverage for these losses and expenses and such denials were without reason. Accordingly, Defendants are in breach of Plaintiff's policy and other Class members' policies.

139. Due to Defendants' breach of Plaintiff's policy and other Class member policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable and are entitled to reasonable attorneys' fees pursuant to S.C. Code § 38-59-40, in an amount to be proved at trial.

### COUNT V: BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING APPLICABLE TO EXTRA EXPENSE
### (By Plaintiff and the Extra Expense Coverage Class)

140. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

141. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendants under South Carolina law.

142. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Class with respect to the Extra Expense provisions in the following respects:

    a. The policy constitutes a mutually binding contract of insurance between Plaintiff and Defendants;

    b. Similarly, the policies of other Class members constitute mutually binding contracts of insurance between members of the Class and Defendants;

    c. Defendants have refused to pay benefits under the contracts;

    d.  Defendants' refusals result from their bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing arising on the contract;

143. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

144. Due to Defendants' breach of Plaintiff's policy and other Class members' policies, Plaintiff and other members of the Business Income Coverage Class have suffered actual and substantial damages for which Defendants are liable and are entitled to reasonable attorneys' fees pursuant to S.C. Code § 38-59-40., in an amount to be proved at trial.

### COUNT VI: DECLARATORY RELIEF APPLICABLE TO EXTRA EXPENSE
### (By Plaintiff and the Extra Expense Class)

145. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Amended Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

146. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendants under South Carolina law.

147. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

148. Plaintiff's policies and the policies of other Extra Expense Class members and members of the Orthodontic Extra Expense Coverage Subclass are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policies.

149. In Plaintiff's policies and the policies of other Extra Expense Class members, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the policies. Specifically, Defendants promise to pay amounts to avoid or minimize the

losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

150. The COVID-19 pandemic has caused Plaintiff and members of the Extra Expense Class covered losses.

151. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff and Class members losses.

152. The extra expenses triggered the Extra Expense coverage under Plaintiff's policies and other Class members' policies.

153. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

154. Defendants, without justification, have refused performance under Plaintiff's policies and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of Plaintiff's policies and other Class members' policies.

155. Plaintiff and Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Class members' extra expenses.

156. An actual case or controversy exists regarding Extra Expense Class members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's policies and other Class members' policies.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment against Defendants, as follows:

1.  An order certifying appropriate classes and/or subclasses, designating Plaintiff as the class representatives and its counsel as class counsel;

2.   A judicial declaration declaring the meaning of the provisions concerning the Business

Income and Extra Expense coverage;

3.   An award of damages and punitive damages to Plaintiff and the Classes in an amount to

be determined at trial;

4.   An award of reasonable attorneys' fees pursuant to S.C. Code § 38-59-40;

5.   An order requiring Defendants to pay both pre- and post-judgment interest on any

amounts awarded, as allowed by law;

6.   An award of costs, as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: July 16, 2021                           Respectfully submitted,


                                              /s/ Graham L. Newman
                                              Mark D. Chappell (Fed. ID No. 106)
                                              Graham L. Newman (Fed. ID No. 9746)
                                              Maggie R. Chappell (Fed. ID No. 13011)
                                              CHAPPELL, SMITH & ARDEN, P.A.
                                              2801 Devine Street, Suite 300
                                              Columbia, South Carolina 29205
                                              (803) 929-3600
                                              (803) 929-3604 (facsimile)
                                              mchappell@csa-law.com
                                              gnewman@csa-law.com
                                              mrchappell@csa-law.com

                                              Richard S. Cornfeld (*Pro Hac Vice* to be submitted)
                                              Daniel S. Levy (*Pro Hac Vice* to be submitted)
                                              1010 Market Street, Suite 1645
                                              St. Louis, Missouri 63101
                                              P. 314-241-5799
                                              F. 314-241-5788
                                              rcornfeld@cornfeldlegal.com
                                              dlevy@cornfeldlegal.com


                                              Anthony S. Bruning((*Pro Hac Vice* to be submitted)
                                              Anthony S. Bruning, Jr. (*Pro Hac Vice* to be

                                              37

submitted)
Ryan L. Bruning (*Pro Hac Vice* to be submitted)
THE BRUNING LAW FIRM, LLC
555 Washington Avenue, Suite 600
St. Louis, Missouri 63101
P. 314-735-8100 / F. 314-898-3078
tony@bruninglegal.com
aj@bruninglegal.com
ryan@bruninglegal.com

Mike Arias (*Pro Hac Vice* to be submitted)
Robert M. Partain (*Pro Hac Vice* to be submitted)
Christopher Swift (*Pro Hac Vice* to be submitted)
ARIAS SANGUINETTI WANG & TORRIJOS,
LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA 90045
T: (310) 844-9696
F: (310) 861-0168
mike@aswtlawyers.com
robert@aswtlawyers.com
christopher@aswtlawyers.com

***Attorneys for Plaintiff***